**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 11-20129

SCOTT WILLIAM SUTHERLAND,
RONALD RAYMOND ROBERTS

Defendants.
_______________________________________/

**OPINION AND ORDER DENYING**
**DEFENDANTS' MOTION TO SUPPRESS EVIDENCE**

Pending before the court is Defendant Scott William Sutherland's April 25, 2011, "Motion to Suppress Evidence" and Defendant Ronald Raymond Robert's May 22, 2011, joinder of Defendant Sutherland's motion. Defendants argue that all evidence obtained from the search and seizure of their persons, and a search of a vehicle and residence, should be suppressed because the search was conducted in violation of their Fourth Amendment rights. Defendants further argue that all statements they made should be suppressed because they were products of an illegal police action, were not voluntary, and that neither Defendant waived his *Miranda* rights, all in violation of their Fourth and Fifth Amendment rights. On July 14, 2011 and July 25, 2011, the court conducted evidentiary hearings on the motion. For the reasons stated below, the court will deny Defendants' motion.

## I. BACKGROUND

The following facts were established or otherwise noted at the hearing. In the very early morning hours on February 12, 2011, Detroit police officers Lt. Christopher Quarello and Officer Daniel Woods, assigned to the narcotics unit but driving a marked scout car and wearing uniforms, were patrolling the area of Dresden Street and Geitzen Street. Sometime after 1:00 a.m., the officers noticed a woman, later identified as Ashley Will, sitting alone in a car. The officers briefly stopped to inquire what Will was doing and see if she needed any assistance. Will indicated that she was waiting for a friend and pointed toward what appeared to be a vacant residence across the street at 17378 Dresden Street. The officers were then called to assist another unit and quickly left. About 20 minutes later, their suspicions aroused, the officers returned to the residence to investigate the boarded-up house to which Will had pointed. Both officers indicated that they commonly find illegal activities, including trespassing, drug trafficking, and squatting, occurring at vacant properties.

The officers parked their police vehicle and approached the dwelling on foot. There was a black sedan parked in the driveway. The officers observed that all of the windows on the first floor had been boarded up and that there were fresh footprints in the unshoveled snow leading to both the front and side doors of the home. They noticed a substantial amount of debris in the backyard and a large quantity of ice frozen to the back wall of the dwelling. Although the first floor was windowless, through a partially-open second floor window at the rear of the building, the officers could see a light and heard two male voices. Standing quietly against the south side of the building, the officers saw the woman, Will, approach and enter through the front door. They then

observed two white males, later identified as Defendants, leave through the same door and walk toward the sedan, a black, 2006 Mercury Milan, parked in the driveway.

The officers approached Defendants, announced their presence, and identified themselves as police officers. They asked Defendants if either of them had written permission from the owner to be inside the dwelling, as is required in the City of Detroit.[1] Roberts stated that he was staying in the home and watching the dwelling for a fire restoration company, but neither he nor Sutherland was able to provide the *written* verification Detroit requires as proof that any person was allowed inside. Later, after Roberts was arrested, he told Lt. Quarello that his "boss" could provide the officer with paperwork stating that he was allowed to be inside the residence.[2] In the interest of

---

[1] "It shall be unlawful for any person; except an officer, employee or contractual agent of a governmental agency in the performance of a public duty; to enter a vacant building or the property it is on without the express written authorization of the property owner, lessee, agent or trustee thereof." DETROIT CITY CODE § 38-1-1.

[2] No evidence was produced, on the scene or at the hearing, of any form of written permission establishing the Defendants' legal presence on the property. At the hearing on July 25, 2011, witness Daniel Pappert, who purported to be a subcontractor charged with the duty of surveiling the property during renovations, was unable to articulate a consistent position regarding whether or not Roberts was allowed to even be present, to say nothing of actually residing in the house. Throughout direct examination, Pappert claimed that Roberts was supposed to perform "weekly checks" on the well-being of the property by "walk[ing] around" and "mak[ing] sure everything is still there," and to sleep overnight at the property only "if he had to." When the court asked Pappert a series of questions to clarify what permissions were granted, he repeatedly contradicted himself. He stated that Roberts was not allowed to live in the home, but subsequently said that he intended to permit Roberts to reside there, and even to permit Roberts to invite others to live at the residence, and that those others could in turn invite guests. Papert's testimony was uncertain, incongruous, and ultimately not credible.

Further, although Pappert originally testified that he had written a permission letter, on cross examination it became clear that Pappert told the FBI in April 2011 first that he did not remember if he had written a letter but that shortly thereafter claimed that he had and that he gave it to Roberts after the arrest. On redirect, Pappert stated there

protecting the officers' safety during this driveway encounter, Quarello approached the dwelling to perform a protective sweep of the home to ensure that no one besides Will was inside.

Woods remained with Defendants. Sutherland was holding a large bundle of keys in one hand and a cell phone in the other, so Woods directed him to put them on top of the black sedan. As Sutherland reached out to do that, his full-length leather coat –a "duster," according to Sutherland's counsel– opened to the extent that Woods observed the butt of a firearm, subsequently identified as a loaded Llama Parabellum 9, tucked into the right front waistband of Sutherland's pants. Woods asked Sutherland if he was armed, and Sutherland responded that he was not. Woods immediately took hold of the weapon and seized it. Woods asked Sutherland if he had a license to carry a concealed weapon, to which he replied that he did not, whereupon Sutherland was arrested. Woods then asked Roberts if he had a weapon, and Roberts replied that he did not. Woods detained Roberts by placing handcuffs on him so that the officers could continue to investigate possible illegal entry and presence in the home.

While Woods was engaged with Defendants, Quarello went to the front door of the home, announced that he was a police officer, and Ashley Will opened the door. When asked if any other persons were inside the home, Will responded that she was just visiting and did not know. Quarello told Will to remain sitting on the couch in the

were actually two letters, one written before the arrest and one later. With no letter in evidence, the record is unclear about whether a letter was written at all.

front room, and he maintained his position in the front doorway.[3] Woods informed Quarello that he had found a loaded and concealed handgun on Sutherland, and that he had handcuffed both Defendants. At that time, other officers arrived on the scene to assist. Quarello entered the residence and conducted a rapid sweep to look for other persons. During this protective sweep, he observed and seized a 12 gauge pistol-grip shotgun loaded with five rounds. The gun was in plain view leaning against a wall on the second level of the dwelling adjacent to the same window from which the officers had seen a light and heard male voices.

Roberts was also arrested at this point for firearm possession. One of the keys that had been in Sutherland's possession was for the Mercury Milan sedan that was parked in the driveway. Woods and several other officers conducted an inventory of the vehicle in preparation for impoundment. When the trunk was opened, a loaded Bushmaster XM15-E25 semi-automatic rifle was observed and seized. The rifle was tagged and the vehicle impounded. Later, after Sutherland had been taken into custody, he asked if local or federal law enforcement officers would be questioning him.

## II. STANDARD

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

---

[3] Will testified that her very first encounter was with numerous officers who hurriedly burst into the house at the same time. Something similar to that happened later, when backup officers arrived, but to the extent that her testimony contradicts Quarello's account of the first encounter, she is not credible.

particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

## III. DISCUSSION

Defendants Sutherland and Roberts argue that the various guns that were seized and statements that were made by Defendants were illegally obtained, and that the court should suppress this evidence as a result.

### A. Investigatory Stop

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that a police officer can stop and question an individual for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. Because the Fourth Amendment to the United States Constitution bars "unreasonable searches and seizures," an officer "must be able to point to specific and articulable facts, which, taken together with rational inferences from those facts," *id.* at 27, give rise to a "reasonable suspicion" that criminal activity is taking place to justify the stop. *Id.* at 30. "The officer must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999) (quoting *Terry*, 392 U.S. at 27. In finding reasonable suspicion, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Arvizu*, 534 U.S. 266, 275-77 (2002). Specifically, there are two factors that should be considered: "'(1) whether there was a proper basis for the stop, . . . ' and, if there was a proper basis for the stop, '(2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand . . . .'" *O'Malley v. City of Flint*, ___ F.3d ___,

2011 WL 3055227, *5 (6th Cir. July 26, 2011) (quoting *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006)). To support an officer's reasonable suspicion of criminal activity as a basis for an investigatory stop, he needs "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *United States v. Sokolow*, 490 U.S.1, 7 (1989)). However, "the greater the degree of intrusion during a stop, the more solid must the officer's suspicion that the stopped individual is guilty of wrongdoing." *O'Malley*, 2011 WL 3055227, *5 (quoting *Smoak*, 460 F.3d at 779).

Officer Woods and Lt. Quarello clearly articulated the reasons for their suspicion that the house was illegally occupied in some capacity by Defendants and others. The building in question appeared to be vacant from the outside and did not appear to be maintained as though it was occupied. For example, the sidewalk snow had not been shoveled, there was wood debris strewn throughout the backyard and a large quantity of ice frozen to the exterior wall as though there were uncontrolled water running somewhere within. Of greatest significance, all of the windows on the first floor were boarded up, rendering the house uninhabitable. But, with all these indicators of uninhabitability, there was a vehicle parked in the driveway at 1:30 in the morning, and through a window that was left open –in the middle of winter– officers heard at least two men having a conversation and then saw a woman enter the residence through the front door. Upon seeing Defendants leave the house, it was reasonable for the officers to suspect that the presence of any of these individuals in the home was illegal and that there may have been other illegal activity associated with their presence.

At a bare minimum, the officers were permitted to approach and momentarily detain or ask Defendants questions based on their judgment that there may be crime afoot. The officers were not required to have "conclusive evidence" to support their "reasonable suspicion" of criminal activity, and, pursuant to *Terry v. Ohio*, were justified in performing an investigatory stop of Defendants. *O'Malley*, ___ F.3d ___, 2011 WL 3055227.

**B. Plain View Seizure**

Sutherland objects to the seizure of the gun from his person, but his claim fails because the firearm was observed in plain view.

Under various circumstances, law enforcement officers are permitted to seize evidence without a warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971). An inspection that "involves merely looking at what is already exposed to view, without disturbing it—is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion." *Arizona v. Hicks*, 480 U.S. 321, 328 (1987). There are three conditions that must be satisfied for officers to lawfully seize under the plain view doctrine: 1) the officer must lawfully be in a position that allows him to view the evidence; 2) "the officer must discover incriminating evidence inadvertently;" and 3) the incriminating nature of the items must be immediately apparent to the officer. *Texas v. Brown*, 460 U.S. 730, 737 (1983) (internal quotations omitted).

Moreover, officers are permitted to seize a firearm in plain view even if there is "nothing readily apparent that establishe[s] its illegality." *United States v. Atchley*, 474 F.3d 840, 850 (6th Cir. 2007). This is because "even if a loaded handgun is legally

possessed, because of its inherently dangerous nature, police may seize it if there are articulable facts demonstrating that it poses a danger." *Id.*

All three conditions that must be met to invoke the plain view doctrine were satisfied in this case. *See Texas*, 460 U.S. at 737. First, the investigatory stop, in and of itself, was lawful, placing Woods in a proper position to see the gun. Second, Woods initially observed the gun only by chance. As Sutherland placed the items he was holding on top of the vehicle, his coat momentarily opened revealing the butt of the firearm. Finally, there are ample "articulable facts," *Atchley*, 474 F.3d at 850, including the suspected illegal presence of all individuals at the residence and the danger to Woods' safety created by the fact that he was by himself with a suspected armed criminal, that immediately demonstrated the potential danger created by the gun under these circumstances. *Texas*, 460 U.S. at 737. Consequently, the seizure of the firearm from Sutherland's waistband was justified.[4]

**C. Expectation of Privacy**

Both Defendants complain about the protective sweep of the Dresdon house, and the seizure of evidence, but neither Defendant had a legitimate expectation of privacy therein. Neither Defendant can complain about the entry or the subsequent

---

[4] Furthermore, even if the gun had not been visible or if Woods had simply failed to notice anything when Sutherland's coat opened, it is nonetheless highly likely that the weapon would have been lawfully discovered and seized soon thereafter. Given the circumstances, it would have been permissible under *Terry* standards for Woods to ask Sutherland to stand still for a few moments while he conducted a superficial pat down designed to detect and neutralize dangerous instrumentalities such as concealed firearms during *Terry* encounters. *Terry,* 392 U.S. at 27; *see also United States v. Frazier*, 249 F. App'x 396, 401-03 (6th Cir. 2007) (holding that the totality of the circumstances justified a pat-down search).

discovery of incriminating evidence.

"Fourth Amendment rights are personal rights . . . which may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969) (citations omitted). Any individual at whom a search is directed, in other words, the "target" of the search, does not automatically gain standing to assert Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 138-140 (1978). The analysis of whether an individual may assert his Fourth Amendment rights "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id*. at 140. A defendant carries the burden of showing that there was, in fact, a violation of his Fourth Amendment rights that permits him to challenge the legality of a search. *Id.* at 130, n.1.

In order to successfully invoke Fourth Amendment protections for the search of a home, a defendant bears the burden of "demonstrat[ing] that he possessed a legitimate expectation of privacy in the area searched." *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005). To demonstrate a legitimate expectation of privacy, an individual "1) must manifest an actual, subjective expectation of privacy; and 2) that expectation [must be] one that society is prepared to recognize as legitimate." *Id.* (quoting *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000)). The court must look to whether Defendants "had a legitimate expectation of privacy which was reasonable in light of all the surrounding circumstances, " and "[i]n considering the reasonableness of asserted privacy expectations, the [Supreme] Court has recognized that no single factor invariably will be determinative." *United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001) (quoting *Rakas*, 439 U.S. at 152).

Houseguests who stay overnight sometimes "may claim the protection of the

Fourth Amendment, but one who is merely present with the consent of the householder may not." *Whitehead*, 415 F.3d at 588 (quoting *Minnesota v. Carter*, 525 U.S. 83, 90 (1998)); *see Pollard*, 215 F.3d at 647-648 (holding that defendant who was a "mere visitor" had no legitimate expectation of privacy because he did not know the lessee, had never been to the premises before, and did not bring any luggage or other personal effects with him. However, co-defendant did have a legitimate expectation of privacy because he was permitted by the lessee, who was also his longtime friend, to be alone in the residence and keep some belongings in a closet). Guests of others who are not the lawful owner or tenant of a property are not entitled to a right of privacy. *See United States v. Berryhill*, 352 F.3d 315, 317-18 (6th Cir. 2003). Furthermore, squatters are not entitled to a right of privacy. *Whitehead* 415 F.3d at 587; *see also United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (holding that a defendant who never claimed to legally own or rent a home, but had been staying in the otherwise vacant residence for one week, did not have a legitimate expectation of privacy).

The house in question here was neither legally occupied, nor was it sensibly habitable. All habitable spaces in residences are required to have windows, and this building effectively had none because all openings on the first floor were closed up by plywood or similar material. Accordingly, it was not in compliance with numerous municipal ordinances for the City of Detroit. Specifically, the residence was deficient in

emergency egress accommodations,[5] minimum lighting requirements,[6] and minimum ventilation requirements.[7] Regardless of the technicalities of these compliance issues, the expectation of privacy for person who is not an owner but who purports to reside in a building in this condition is simply not an expectation that "society is prepared to recognize as legitimate." *Pollard*, 215 F.3d at 647.

Even if this house had been suitable for someone's occupancy, Defendants still would not have met their burden of demonstrating that *they* had a legitimate expectation of privacy in the residence. During both hearings, Defendants presented evidence that Roberts and another woman with her baby actually lived at the home and considered it their residence for at least a short time. Regardless of whether Roberts had a bedroom set upstairs, a couch and television in the living room, and a tenant with her belongings in the bedroom on the first floor, Roberts did not show that he enjoyed any legal basis for his presence in the house. Neither the owner of the property nor the owner or operator of the fire restoration company hired to renovate the property testified at the hearings, and, as was discussed earlier, the purported subcontractor hired by the fire restoration company never produced written proof that Defendants were legally

---

[5] "In sleeping areas, at least one (1) window shall be operational and accessible from inside the room without the use of keys or tools to provide for emergency escape and rescue." DETROIT CITY CODE § 9-1-405.

[6] "All habitable spaces shall have at least one (1) window of approved size that faces directly to the outdoors or to a court. The minimum total glazed area for every habitable space shall be eight (8) percent of the floor area of such room." DETROIT CITY CODE § 9-1-374.

[7] "All habitable spaces shall have at least one (1) openable window. The total openable area of the window in every room shall be equal to at least 45 percent of the minimum glazed area required in section 9-1-374." DETROIT CITY CODE § 9-1-377.

permitted to be present inside the residence, or even that he had the authority to grant such permission.

For these reasons, Defendants did not establish the legitimate expectation of privacy that was required for any claim of a Fourth Amendment violation occurring in the residence.

**D. Protective Sweep**

For completeness, the court will address the sweep of the house, assuming for the analysis that Roberts had established his standing to complain. The court finds that the sweep was in fact justified under the circumstances presented.

A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A properly-conducted protective sweep does not violate Fourth Amendment protections. *Id*. Although the purpose of a protective sweep is to ensure that there are no additional dangerous persons hiding in close proximity to the arrest scene, *id.* at 337, guns that are found in plain view during a legal protective sweep may be seized by law enforcement. *See Atchley*, 474 F.3d at 850 ("Once the officers were legitimately inside Atchley's motel room in order to conduct the protective sweep, the officers could lawfully seize any object in plain view so long as the object's incriminating character was immediately apparent and the officers had a lawful right of access to the object itself.").

Here, officers were justified in conducting a protective sweep of the residence because their safety could have been jeopardized by the presence of other individuals in the house. The officers watched Ashley Will enter the premises shortly before

Sutherland's arrest, and she had indicated that she was going to meet "a friend" at the house when the officers interacted with her earlier in the evening. She was now out of their sight inside. The officers had no information to indicate that Will was, or was not, dangerous. They did not know at that point whether she was indeed visiting another person inside the residence, nor could they be certain that Sutherland and Roberts were the men they heard talking through the open window. Thus, the officers had a "reasonable belief based on specific and articulable facts" that the house from which Defendants exited may have "harbor[ed] an individual posing a danger to those on the arrest scene." *Buie* at 337. Quarello and the other officers who entered the home did so to protect their personal safety, and saw the shotgun leaning against the wall in plain view when they entered the upstairs bedroom. The protective sweep was proper, there is no indication that it went beyond the stated purpose or scope, and therefore Defendants' claims that their Fourth Amendment rights were violated by the officers entering the house without a warrant fail. The seizure of the shotgun confiscated as a result of the protective sweep was permissible.

**E. Statements**

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Law enforcement officers must also inform suspects of certain rights before interrogating them, including the right to remain silent. *Miranda v. Arizona*, 384 U.S. 439 (1966). However, these rights apply only to those persons who are actually in custody when they are interrogated. *Id.* at 444. The analysis of whether a subject is "in custody" involves two separate and objective considerations. *Thompson v. Keohane*, 516 U.S. 99, 112

(1995). The first consideration involves looking at "the circumstances surrounding the interrogation," and the second inquires whether or not "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave." *Id*. at 113. The subjective interpretations of both police officers and suspects are irrelevant to this analysis. *Stansbury v. California*, 511 U.S. 318, 323 (1994). The advantage of the objective test is that it "avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (Jun. 16, 2011).

The officers made initial inquiries upon their fierst approach to Sutherland and Roberts. It is obvious that neither man was in custody at that time, and if written permission to be present had been produced, this *Terry* encounter very likely would have terminated with no police action. Sutherland's responses to the officers' threshold questions included, however, that 1) he did not have written permission to be in the dwelling; 2) he did not have a weapon, contrary to what Woods could plainly see; and 3) he did not have a valid concealed pistol license.[8] Roberts' responses to those same initial questions included that 1) he was staying in and watching the dwelling for a fire restoration company; 2) he was not armed; and 3) his boss could provide paperwork verifying that he was allowed to be inside the residence after he was arrested.

Considering the totality of the circumstances, Defendants answered all but one of

---

[8] Sutherland also asked who would be questioning him, local or federal law enforcement. Because this was a volunteered statement that was not in response to the officers' questioning, it is not subject to *Miranda* protections. *See Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980).

these questions both at the commencement of the interaction with the officers, substantially before either of them was arrested. Roberts did not tell the officers that his boss could provide paperwork verifying permission to be inside the dwelling until after he was formally arrested, but it is not clear that this statement was in response to interrogation as opposed to having been a volunteered exculpation.

Save the one statement made by Roberts after formal arrest procedures were executed, Defendants were not in custody when they responded to the officers' questions.[9] Accordingly, the absence of reading *Miranda* rights is not a proper basis for suppressing any of Defendants' statements.

During an investigatory stop, law enforcement officers are allowed to question individuals as long as the questions are "directly related in scope to [their] reasonable suspicion that a crime had occurred." *United States v. Wright*, 220 F. App'x 417, 419-420 (6th Cir. 2007). Defendants' responses to the officers' initial questions regarding their presence in the vacant dwelling were closely related to the officers' suspicions that Defendants were engaged in criminal activity. Responses in relation to possession of weapons was related to the officers' concerns for their immediate personal safety and the suspicion of weapons involved in the potential criminal activity that was the subject of the investigatory stop.

### F. Inventory of Vehicle

The rifle found in the truck of Sutherland's car was the proper result of an

[9] Although not explained as such, it is clear to the court that the direction to Sutherland to put down the large bundle of keys in his hand was nothing more than asking him to dispossess himself of something that could be used as a weapon during a *Terry* encounter. It was not equivalent to an arrest.

inventory search, recognized as "a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). The government's objectives of inventory searches are to protect owners' property while it is in police custody, protect law enforcement from lost, stolen, or vandalized property claims and protect police officers from danger. *Id.* at 372; *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). "The standard of probable cause is peculiarly related to criminal investigations, not routine, noncriminal procedures," and thus "[t]he probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions," such as inventory searches. *Opperman*, 428 U.S. at 370, n.5.

The practice of inventorying property is a reasonable and routine police action. *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983); *Opperman* 428 U.S. at 375. To prevent "general rummaging in order to discover criminal evidence," law enforcement officers should comply with written policy when they perform inventory searches. *Florida v. Wells*, 495 U.S. 1, 3 (1990). However, officers can be given some discretionary latitude to determine if a container "should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id*. at 4.

Woods, who seized the semi-automatic rifle from Sutherland's vehicle, testified that officers were not searching the vehicle pursuant to a warrant, but merely taking an inventory of the vehicle by documenting all personal property in the car before it was to be impounded subsequent to the physical arrest of the two Defendants. There was no "investigatory police motive" in these actions. *Opperman*, 428 U.S. at 376. In this case, the officers complied with procedure both "to protect [the] owner's property" while it was

in police custody and "to insure against claims of lost, stolen, or vandalized property." *Bertine,* 479 U.S. at 372. In fact, Woods and Quarello waited for the tow truck to arrive after Defendants were transported to the station, demonstrating the officers' objective of protecting the vehicle owner's property. Merely opening the trunk did not transform an otherwise-legal inventory of the vehicle to an illegal search.[10] Opening a trunk is not the type of "general rummaging," *Wells*, 495 U.S. at 3, that would transform the search into a "purposeful and general means of discovering evidence of crime," *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring). The rifle was lawfully seized properly.

## IV. CONCLUSION

For the reasons stated above, IT IS ORDERED that Defendant Sutherland's "Motion to Suppress Evidence" [Dkt. # 13] and Defendant Roberts's "Notice of Joinder" in the motion [Dkt. # 20] are DENIED.

S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: August 25, 2011

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 25, 2011, by electronic and/or ordinary mail.

S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

---

[10] There is some discrepancy regarding who opened the trunk. Woods testified on direct examination that another officer opened the trunk, saw the gun, and immediately called him over, though he did not remember which officer it was. However, during cross examination Sutherland's attorney claimed that the police report, Woods wrote that he was the individual who opened the trunk. This issue is immaterial, however, because the action itself was proper as part of standard inventorying procedures.